# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00677-CR

**Montrell Washington, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF LEE COUNTY, 21ST JUDICIAL DISTRICT
### NO. 7179, HONORABLE TERRY L. FLENNIKEN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant, Montrell Washington, of the offense of aggravated assault with a deadly weapon for setting his uncle on fire, causing seriously bodily injury. *See* Tex. Penal Code Ann. §§ 22.01, .02 (West 2011). Punishment was assessed at eight years' imprisonment. In one issue, appellant asserts that the evidence is legally insufficient to sustain his conviction. We will affirm the judgment.

## BACKGROUND

The jury heard evidence that on February 18, 2010, Austin Police Department Officer Duane Williams was working off duty providing security services at Brackenridge Hospital in Austin. On that day a hospital social worker reported to him that two men had brought Donald Washington to the hospital with severe burns that initially were believed to have been accidental. The social worker informed Williams that she had received a phone call from a person

claiming to be a member of Donald's family who told her that the burns may not have been accidental.[1] After learning that the incident had occurred in Lee County, Williams contacted the Lee County Sheriff's Department. A Lee County deputy asked Williams to talk to the two men who had brought Donald in to try to determine what had happened. When the two men, appellant and Jonathan Jackson, returned to the hospital several hours later, Williams interviewed them separately. Appellant told the officer that Donald had burned himself while using lighter fluid to start a fire in a wood burning stove in his house. Jackson told Williams a similar version of the events. Williams was not able to speak to Donald, who was in critical condition and was intubated at the time. Donald was subsequently transported to Brooke Army Medical Center in San Antonio.

Frank Washington, Donald's brother and a resident of the house where Donald was burned, testified that he got home from work around 5:00 on the evening of February 18. Appellant, Donald, and Jackson were sitting around the dining room table. Frank stated that he went to his room and was sleeping when he heard someone screaming. He ran out of his room and saw Donald with his t-shirt on fire. Frank and appellant pulled the shirt off Donald. Frank testified that Jackson was in the kitchen and appellant was standing by the doors leading into the kitchen. Frank testified that he dialed 911 but "couldn't get anyone." Frank testified that he asked appellant what happened and appellant said that Donald was trying to start a fire in the stove. He then called his sister, Patricia Ward, and another of his sisters, Marilyn Washington Alexander.

---

[1] Because the appellant and several of the witnesses share the same surname, we use first names where necessary for clarity.

Alexander, Donald's sister and appellant's aunt, testified that she received a phone call from her brother Frank on the evening of February 18. After receiving the call, Alexander went to the house. Frank was at the house when she arrived. Alexander stated that Frank was upset because Donald had been burned. There were burn spots on the carpet and on the floor. Alexander saw a bottle of rubbing alcohol sitting on a table and observed that there was no fire burning in the wood stove. Alexander testified that she called appellant and asked him what had happened at the house and that appellant told her "it was a prank that went bad" and that he was taking Donald to the hospital. Alexander remained at the house until 11:00 that evening. When she returned to the house the following day, appellant and Jackson were there. When she again asked him what happened, appellant repeated that "it was a prank that went bad," and "[Donald] told us to say that he was making a fire in the stove, and that's what I'm going to say." When Alexander told him that he needed to tell the truth, appellant replied that he was going to stick to the story that Donald had been making a fire in the stove, and that "they're going to have to prove that he did it." Alexander testified that appellant said "I did it," and then looked at Jackson and said "We did it. They're going to have to prove we did it." Alexander told appellant and Jackson that they needed to tell the truth because Donald was seriously injured and had been flown to a burn center. Appellant told her that they had been "playing" with Donald by putting alcohol on his hand and foot and lighting it. Alexander stated that she noticed the alcohol bottle was gone, and things that had been on the table the night before were missing. Later that night, appellant called Alexander and told her that he didn't do it, but that he had said he did in order to protect Jackson because he didn't want the family to be mad at Jackson. Alexander testified that she told him he needed to tell the truth.

Patricia Washington Ward, Donald's sister and appellant's aunt, testified at trial that on the evening of February 18 she received a phone call from her brother Frank. According to Ward, Frank asked her where he should take a person who has been badly burned and said to her "Montrell is sitting up here and set Major on fire.[2] He thinks it's a Goddamn joke." Ward advised Frank to take Donald to Brackenridge Hospital in Austin and gave him directions to the hospital. During that conversation, Frank also said to Ward: "It's a damn shame how they done burned this man up. It don't make no damn sense. If I had a gun, I'd bust a cap in Montrell's ass, and Jonathan's."[3] Later that evening, Ward called her sister, Cassandra Fonteneaux, and informed her that Frank had said that appellant had set Donald on fire, that Donald was badly burned, and that appellant and Jackson were laughing but that it "wasn't no goddamn joke." Ward also testified that she spoke to appellant on the phone and asked him why he set his uncle on fire, to which appellant responded "I didn't do a damn thing. I want a m— f— to prove that I did it. I'll just say I was in another damn room. I'll say I was in the room cooking."

Another of Donald's siblings, Richard Washington, testified that in the early morning hours of February 19, appellant knocked on his door. Richard said he talked to appellant and asked him what happened. Appellant said that Donald had set himself on fire when building a fire in the wood stove. Richard, who had been at the house shortly after Donald was taken to the hospital and had observed that the wood stove was cold, told appellant that the evidence would not support his

---

[2] Ward had previously testified that Donald went by the nickname "Major."

[3] Frank testified at trial that he did not say this to Ward. Rather, he stated that he told her what he would do if he *thought* appellant had set Donald on fire. He also testified that he did not remember telling Ward how appellant reacted to the fact that Donald had been burned. Frank also denied that appellant told him the burning was the result of "a prank gone bad."

story and that he should tell the police the truth. According to Richard, appellant stated that he was going to stick with the story about the wood stove. However, appellant also told Richard that "it was a prank that went bad."

The Texas Rangers were called in to assist the Lee County Sheriff's Department investigate the incident. Texas Ranger Brent Barina testified that when he interviewed appellant, appellant told him that Donald had sprayed lighter fluid on wood in the wood stove and when he lit the lighter fluid it flashed out of the stove and caught his shirt on fire. Jackson told him a similar version of the events. Barina also stated that during a second interview, appellant said that Jackson had been tickling Donald's ears with straw from a broom while he was sleeping. Appellant reported that Jackson had also been about to pour alcohol on Donald's mustache, but that appellant told him not to because Donald might inhale the fumes. Appellant related to Barina that when he was five years old, his cousins used to pour alcohol on his hand and light it on fire. Barina testified that this "raised a flag as to what might have happened to [Donald]."

Eashia Wilson, Jackson's girlfriend at the time, testified that on February 19 she accompanied appellant, Jackson, and appellant's then-fianceé, Jamie Green Washington,[4] to the Lee County Sheriff's Department, where appellant and Jackson went to give statements. Wilson stated that she heard appellant tell Jamie to remove the alcohol bottle from the room. Jamie testified at trial that on February 18 appellant called her and told her to come to the house because Donald had burned himself. She drove to the house, and she, appellant, Jackson, and Donald drove in her car

---

[4] Jamie and appellant married approximately one week after Donald was burned.

to Brackenridge Hospital. Jamie testified that appellant told her during the ride that Donald burned himself when putting wood in the wood burning stove.

Jackson testified at trial after receiving a grant of immunity by the State. Jackson testified that on February 18 he, appellant, Donald, and a couple of other people were playing dominoes, drinking, and having a good time together. Frank came home in the late afternoon. That evening, the only people remaining at the house were appellant, Frank, Jackson, and Donald, who was asleep on a day bed in the living room. Jackson testified that he and appellant were "messing with" Donald by tickling his face with straw from a broom in an attempt to make him slap himself. According to Jackson, appellant then got a bottle of rubbing alcohol, poured two capfuls on Donald's hand, and lit the alcohol. Jackson stated that he was in a bedroom but could see appellant and Donald. Jackson stated that Donald woke up and yelled, "Why are you burning me?" Appellant responded that because Donald said he would "get him" if appellant fell asleep, since Donald fell asleep first he was "getting him." Jackson testified that he and appellant thought the prank was funny, and after Donald went back to sleep, Jackson told appellant, "Let me try it." Jackson then poured two capfuls of rubbing alcohol on Donald's toe and tried to light it. Appellant told him he was doing it wrong, and poured seven capfuls of rubbing alcohol on Donald's toe at which point Jackson went back to a bedroom to watch television. He then heard Donald yelling at appellant and asking him why he was burning him. Appellant was laughing and Frank walked in and told appellant and Jackson to leave Donald alone. Jackson testified that Frank then left the room and Donald went back to sleep, at which point appellant asked Jackson to help him untuck Donald's shirt. Jackson started to help, but then said he "couldn't do it" and went back to the bedroom to

6

smoke a cigarette. He testified that he believed appellant was going to pour alcohol on the shirt and light it, and he was worried. About 30 seconds later Jackson heard Donald screaming. According to Jackson, appellant had poured alcohol on Donald's shirt and then lit the shirt on fire. After that, appellant, Jamie, and Jackson took Donald to Brackenridge Hospital. Jackson testified that on the way to the hospital, appellant said to Donald, "Don't tell them I burned you." Donald replied, "Don't worry, Doc. I know what to tell them." When they got to the hospital, Donald told a hospital employee that he burned himself lighting the stove. Jackson testified that he was afraid to tell the truth about what happened, so he told the police officer at the hospital that Donald got burned trying to light the stove. Jackson also testified that on the way back from the Lee County Sheriff's office the next day, appellant instructed Jamie to remove the rubbing alcohol bottle from the coffee table in the living room. Jackson stated that a few days later he told his aunt the truth about what had happened and then gave a statement to the police.

After the State rested, appellant took the stand. Appellant testified that on February 18 he, Donald, and some others had spent the afternoon playing dominoes. Frank arrived at the house around 4:00 in the afternoon. Appellant stated that he called Jamie that evening and asked her if she wanted something to eat. He then began preparing dinner. Appellant stated that he then joined Jackson and Donald, who was asleep, in the living room. According to appellant, Jackson began tickling Donald's ear with a score card from the dominoes game. Jackson then took a straw from a broom and tickled Donald's nose, causing him to slap himself. Appellant testified that at one point Donald slumped over and he could see Jackson looking at a bottle of rubbing alcohol, and he told Jackson to "cool it." Then he went back into the kitchen. Appellant testified

7

that soon after, Jackson came running through the kitchen and went into the laundry room. Then appellant saw Donald running toward him with his shirt on fire. Appellant stated that he grabbed Donald's shirt to try to help Donald pull it off. He filled a container with water and went to Donald at which point Frank was trying to pull Donald's shirt over his head. Appellant said that he used the water to put out the fire burning Donald's shirt and also poured some water on Donald. Appellant testified that Jackson was the person who lit Donald on fire, and that appellant initially took responsibility because he wanted to protect Jackson and prevent the family from turning against him.

The jury found appellant guilty of the offense of aggravated assault with a deadly weapon causing serious bodily injury, as alleged in the indictment. The district court sentenced him to eight years' imprisonment. This appeal followed. In his sole appellate issue, appellant contends that the evidence is legally insufficient to sustain his conviction. Specifically, he argues that there was insufficient evidence corroborating the testimony of the alleged accomplice witness, Jackson.

A person commits the offense of aggravated assault causing serious bodily harm if he intentionally, knowingly, or recklessly causes serious bodily injury to another or uses or exhibits a deadly weapon during the commission of an assault. *See* Tex. Penal Code Ann. §§ 22.01, .02 (West 2011). In evaluating the sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Williams v. State*, 301 S.W.3d 675, 683-84 (Tex. Crim. App. 2009). This standard "gives full play to the jury's responsibility to fairly resolve conflicts in the evidence, to weigh the evidence, and to draw reasonable inferences from the evidence." *Williams*, 301 S.W.3d at 684 (citing

*Threadgill v. State*, 146 S.W.3d 654, 663 (Tex. Crim. App. 2004)). It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

The accomplice-witness rule provides that a defendant cannot be convicted of an offense upon the testimony of an accomplice witness without other corroborating evidence "tending to connect" the defendant to the offense. Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). "When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we 'eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime.'" *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). "To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Id.* (citing *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999); *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)). "Rather, the evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense." *Id.* (citing *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)). "There is no set amount of non-accomplice corroboration evidence that is required for sufficiency purposes; '[e]ach case must be judged on its own facts.'" *Id.* (quoting *Gill*, 873 S.W.2d at 48).

The State contends that Jackson should not be considered an "accomplice."[5] We need not decide whether Jackson was an accomplice witness, however, because even if he were, his testimony was sufficiently corroborated. There is other evidence in the record, apart from Jackson's testimony, tending to connect appellant to the offense. First, there is no dispute that appellant was at the house when Donald was burned. In addition, Marilyn Alexander testified that when she went to the house after it happened, appellant told her that "it was a prank that went bad," and told her that he intended to say that Donald had been burned while making a fire in the stove. Marilyn testified that appellant said to her, "I did it," then looked at Jackson and said, "We did it." Alexander testified that appellant had stated that he and Jackson were "playing" with Donald by putting alcohol on his hand and foot and lighting it. Ward testified that after the incident Frank called her and told her that appellant set his uncle on fire. According to Ward, Frank also said, "It's a damn shame how they done burned this man up. . . . If I had a gun, I'd bust a cap in Montrell's ass, and Jonathan's." Ward further testified that appellant indicated to her that he intended to lie about what happened, stating, "I'll just say I was in another room. I'll say I was in the room cooking." Finally, Richard testified that appellant told him Donald had set himself on fire lighting the wood stove, a story Richard did not believe since he had been to the house that evening and the stove appeared unused. Richard said that he told appellant to tell the truth, but that appellant said he was going to stick with the story about the wood stove. According to Richard, however, appellant also told him that "it was a prank that went bad." From this evidence, a rational jury could reasonably infer that appellant was present

---

[5] To be considered an accomplice witness, the witness's participation with the defendant must have involved some affirmative act that promotes the commission of the offense with which the defendant is charged. *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007).

10

and involved in the activities that led to Donald's being burned, and that appellant was involved in the offense.

Viewing the evidence in the light most favorable to the verdict, we conclude that there is sufficient evidence tending to connect appellant to the offense. *See Simmons v. State*, 282 S.W.3d 504, 511 (Tex. Crim. App. 2009) (holding that non-accomplice evidence should be "viewed together, rather than as isolated, unrelated incidents" when assessing its sufficiency). Thus, the testimony of Jackson is sufficiently corroborated, and we can consider it in our overall sufficiency analysis. *See McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997); *Figueroa v. State*, 250 S.W.3d 490, 501 (Tex. App.—Austin 2008, pet. ref'd). We have already summarized Jackson's testimony implicating appellant as the person that lit Donald on fire. We hold that the combined and cumulative force of his testimony and the other evidence considered by the jury, when viewed in the light most favorable to the verdict, would enable a rational trier of fact to find beyond a reasonable doubt that appellant committed aggravated assault with a deadly weapon causing serious bodily injury, as alleged in the indictment.

## CONCLUSION

We overrule appellant's sole appellate issue and affirm the judgment of the district court.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed:   August 9, 2012

Do Not Publish

12