Katherine Michelle **NADAL**, Appellant,

v.

**The STATE of Texas, Appellee.**

**No. 14-09-00756-CR.**

Court of Appeals of Texas, Houston (14th Dist.).

July 7, 2011.

---

Gary M. Polland, Houston, for appellant.

Jessica Akins McDonald, Houston, for state.

Panel consists of Justices BROWN, BOYCE, and JAMISON.

## OPINION

MARTHA HILL JAMISON, Justice.

Appellant, Katherine Michelle Nadal, appeals from her conviction for causing serious bodily injury to a child. She raises seven issues on appeal, contending: (1) the evidence is legally insufficient to sustain the verdict, (2) the evidence is factually insufficient to sustain the verdict, (3) the evidence is legally insufficient to sustain the jury's finding that she used a deadly weapon in commission of the offense, (4) the trial court erred in admitting certain photographs into evidence, (5) the prosecution engaged in a pattern of misconduct throughout the trial, (6) the trial court erred in admitting certain hearsay testimo-ny, and (7) she received ineffective assistance of counsel. We affirm.

## Background

On March 13, 2007, a five-month-old male child was mutilated by having his genitals and tissue from his upper left leg removed. Appellant, the child's mother, was arrested and charged with causing serious bodily injury to a child. A jury subsequently found her guilty, found that she used a deadly weapon in committing the offense, and assessed her punishment at ninety-nine years in prison and a $10,000 fine.

## Injury to a Child

In her first two issues, appellant contends that the evidence is legally and factually insufficient to sustain the jury's verdict finding her guilty of injury to a child. While this appeal was pending, a majority of the Court of Criminal Appeals agreed that only one standard should be used to evaluate the sufficiency of the evidence in a criminal case: legal sufficiency. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex.Crim. App.2010) (plurality opinion); *id.* at 926 (Cochran, J., concurring). Accordingly, we review the sufficiency of the evidence in this case under a rigorous and proper application of the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), legal sufficiency standard. *Brooks*, 323 S.W.3d at 906; *Pomier v. State*, 326 S.W.3d 373, 378 (Tex.App.-Houston [14th Dist.] 2010, no pet.).

 When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether a rational jury could find the essential elements of the crime beyond a reasonable doubt. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010); *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App.2007). This court does

not sit as a thirteenth juror and may not substitute its judgment for that of the fact finder by re-evaluating the weight and credibility of the evidence. *Isassi,* 330 S.W.3d at 638; *Williams,* 235 S.W.3d at 750. Instead, we defer to the fact finder to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences supported by the evidence. *Williams,* 235 S.W.3d at 750. Our duty as a reviewing court is to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime. *Id.*

 In the jury charge, the trial court properly instructed the jury that "a person commits an offense if she intentionally or knowingly, by act, causes to a child, serious bodily injury." *See* Tex. Penal Code § 22.04(a). It defined "serious bodily injury" as "a bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *See id.* § 1.07(a)(46). It further explained that "a person acts intentionally, or with intent, with respect to a result of her conduct when it is her conscious objective or desire to cause the result," *see id.* § 6.03(a), and "a person acts knowingly, or with knowledge, with respect to a result of her conduct when she is aware that her conduct is reasonably certain to cause the result," *see id.* § 6.03(b).

Appellant does not contest in this case that the child suffered serious bodily injury, nor does she suggest that even though she may have caused such injury, she did not possess the requisite mental state for the offense. Instead, appellant insists that the evidence was insufficient to establish that she was the cause of the serious bodily injury to the child. The evidence pointing to appellant as the perpetrator was circumstantial in nature, but it was sub-stantial. *See generally Scillitani v. State,* 297 S.W.3d 498, 500 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (explaining that under *Geesa v. State,* 820 S.W.2d 154, 158 (Tex.Crim.App.1991), the same legal sufficiency standard governs cases proven by circumstantial evidence as cases proven by direct evidence).

Camden Gothia testified that he met appellant when he was in his early 30s and she was in her early 20s. Soon thereafter they began to live together. He said that when they first met they "did a lot of partying," but when he became ready to stop, she was not ready. They were together for several "tumultuous" years, and Gothia finally broke up with appellant over the partying issue.

In July 2006, Gothia learned that appellant was pregnant, and he agreed to live with her again. The child was born on February 1, 2007. Shortly thereafter, Gothia and appellant got a miniature dachshund puppy named Shorty. Gothia said that he never saw Shorty attack or growl at anyone, and Shorty never showed any aggressiveness towards the child. At the time the child was injured, Shorty weighed about seven pounds.

The child was healthy when born. Appellant wanted the child to be circumcised, but Go thia did not. According to Gothia, the couple had "robust" conversations over this dispute and nothing had been settled by the time the child was injured. He further suggested that appellant probably resented receiving input on the matter from Gothia's sister, Patches Deshazo. The evidence revealed that a doctor's referral for a circumcision was issued, and shortly thereafter, a doctor's appointment for the child was cancelled; however, Gothia did not recall whether the appointment had anything to do with circumcision.

Gothia further testified that on March 12, 2007, after he got home from work around 5 or 6 p.m., appellant told him that she and her friend, Tressa Shanley, were taking the child to Wal–Mart. Although the trip was supposed to be a short one, they were gone for more than four hours. When they arrived back at the apartment, appellant did not appear sober. Gothia said that he probably yelled at her but conversation was pointless with her in that condition.

The next morning, March 13, Gothia said that appellant was sober and she went to get methadone from a treatment center before he left for work. After she returned, Gothia told her that they needed to have a serious talk when he got home and that the previous night was "the final straw." When he left for work, she slammed and then locked the door. During the day, Gothia called appellant on the couple's cell phone multiple times but did not get an answer until his final call at 3:53 p.m. Appellant was upset when she answered and told Gothia that he needed to get home because Shorty, the dog, had bitten the child. According to Gothia, appellant sounded intoxicated and was "slobbering and crying." He headed home immediately.

When he arrived, appellant and an animal control officer were at the apartment. Appellant told him that everything was going to be fine and that the child was in good hands. She said that she had come back home because there was nothing she could do at the hospital. When Gothia went into the bedroom, he saw a lot of blood on the bed and collapsed to the ground. By the time he left for the hospital, appellant was sleeping on the couch. Later, appellant returned to the hospital but was not there when the child came out of surgery. The last time Gothia talked to appellant was in a telephone conversation in which she said, "I know I fucked up. You don't have to bury me." Gothia said the child was in the hospital for six to eight weeks.

Thomas Henry, a maintenance supervisor at the apartments where the couple lived, testified that on the morning of March 13, 2007, he heard a child crying loudly from appellant's apartment. He then later saw appellant and a resident named Adam walking together toward Adam's apartment, but they did not have a child with them.

Edward Vega, another resident of the apartment complex, testified that before noon on March 13, 2007, appellant knocked on his door and said something was wrong with her child. Appellant appeared disoriented but was not crying. Edward called 9-1-1 while appellant and Edward's wife, Rita, went to appellant's apartment. When Edward entered the apartment, he saw the child near the end of the bed with "part of his bottom" and "[h]is genital area ... gone." Edward grabbed a nearby diaper that appeared to be clean and applied pressure with it to the wound. The child was turning blue and was not moving or making any sounds. Except for a puddle of blood near one leg of the child, Edward did not see any other blood in the area of the bed and did not see any paw or hand prints.

Edward asked appellant what had happened, and she responded that "the dog had done it." Edward was with the child until the paramedics arrived, and at no point did appellant come into the bedroom where the child was. Edward testified on direct examination that he did not see appellant shed any tears, but on cross-examination he acknowledged saying in his 9-1-1 call that appellant was crying. Rita told appellant to go with the ambulance. After appellant and the paramedics left, Edward saw hot water running in the sink.

He looked at the dog and did not see any blood on it. He also did not see any blood on the floor of the apartment or on the patio where the dog was when they arrived at the apartment.

Rita Vega provided similar testimony to that of her husband. She said that when she first went into the bedroom to check on the child, appellant was in the living room "hunting a cigarette." When the paramedics got into the ambulance with the child, appellant did not follow until Rita told her to do so. After they left, Rita noticed that the garbage disposal was on in the kitchen and hot water was running in the sink. She examined Shorty "real good"; he was not behaving aggressively or strangely and had no blood on him. Later that day, Rita saw appellant, Gothia, and a lady from animal control at the apartment. Rita asked appellant why she was home, and appellant said the hospital told her that she could go home. Still later, Rita saw appellant at the apartment complex carrying a tall can of beer. When asked about it, appellant said, "My nerves is all upset. I need it." She described appellant at various times as shaking but not crying.

Richard Ponce, a City of Houston paramedic, testified that he responded to the call to appellant's apartment. Ponce found the child on the bed with a portion of his thighs and his entire genital area removed. When Ponce touched the child, the child began to cry. Ponce immediately wrapped the child in a trauma blanket and carried him to the ambulance. Appellant rode in the ambulance to the hospital. Ponce said that she appeared hysterical during transport but did not cry and only touched the child briefly one time. When he asked her what had happened, "she just kept stating that the dog had eaten him." She said that when she woke up from sleeping on the couch, the dog was licking the child

"down there." Ponce further testified that he did not see blood in the apartment except on the bed.

Ponce's partner on the day in question, Dean Zalesnik, testified similarly to Ponce in several respects and added that the edges of the injury looked straight and "[v]ery clean ... like lacerations." He explained that when flesh is cut with a sharp object, the edges of the cut will be straight.

Tressa Shanley testified that at the time of trial she was in jail for possession of a controlled substance but she had not been promised anything in return for her testimony. Shanley explained that on March 12, 2007, she and appellant went to purchase cocaine from Shanley's brother-in-law after having misled Gothia into thinking they were going shopping. Shanley further described how later that day she saw appellant take Xanax pills and inject herself with liquid cocaine. According to Shanley, appellant injected the cocaine while in a restroom with the child in his carrier on the restroom floor. Shanley also described other times during that day when appellant went into a restroom with a bag that contained cocaine and then came out after 30 to 45 minutes, "very hyper and awake."

On March 13, 2007, Shanley drove appellant home from the hospital after appellant called her. Shanley described appellant as "very spaced-out looking," and appellant said that she had left the child alone for about five minutes when the dog jumped on the bed and bit him on his genitals. Appellant further said that "there was blood all over." Shanley noticed during the ride that appellant had needle marks on her arm.

Adam Windsor testified that he lived at the same apartment complex as appellant. In the morning of a day in March 2007, on which he later observed an ambulance at

the apartment complex, he was outside smoking when appellant approached him and asked for a cigarette. He said that she was wearing flannel pajamas despite the heat and appeared "like she was on speed ... very jittery, very jumpy." She did not have a child with her.

Dr. Elizabeth Jones is an emergency room physician who treated the child upon arrival at the hospital. She described his injuries and the treatment provided upon admission. She said that the paramedics told her that a dog had reportedly bitten the child's genitalia off, but the wound did not appear to be a dog bite to her. She explained that the edges of the wound were "very straight" and that there was no scallop pattern, as teeth would tend to make, or bruising, as she would expect to see from a bite. She further noted that there were no stray puncture wounds in the area. Jones concluded that a sharp instrument had caused the injury. Jones said that when she told appellant about the child's injuries and need for surgery, appellant asked how long the surgery would last because "she had some things to do at home." According to Jones, the injury suffered by the child created a substantial risk of death and would result in permanent disfigurement.

Dorie Crouch, a social worker assigned to the hospital where the child was taken, testified that appellant told her at the hospital that she and the child were asleep in bed, and she woke to find the child whimpering and the dog standing over him. Crouch described appellant as "being in shock" and tearful. Appellant denied using drugs or alcohol.

Ladonya Davis, a City of Houston Animal Control officer, went to appellant's apartment to investigate on the afternoon of March 13, 2007. When Davis arrived, appellant was walking across the parking lot, carrying a can of beer in a plastic bag. Appellant explained to Davis that she had been sleeping on the couch when she heard the child, and when she checked on him, she found him in a pool of blood beside the dog. While Davis was at the apartment, Camden Gothia arrived, rushed into the apartment, and asked what was going on. Appellant told him that the child had been bitten by the dog and was now at the hospital. Davis said that Gothia went into the bedroom and began "crying and screaming" and fell to the floor. He then sat on a mattress in the dining or kitchen area. Appellant sat beside him and told him "it was all a part of growing up." Gothia then responded "a child growing up is not a part of getting his stomach ate out [*sic* ]".[1] Davis took possession of Shorty and delivered him to the Houston Bureau of Animal Regulation and Control (BARC).

Armando Morin testified that in 2007, he was an investigator for Child Protective Services. He arrived at appellant's apartment in the evening of March 13, 2007. Appellant told him that the child was wearing a diaper when he was attacked by the dog and that she may have thrown the diaper in a dumpster. Martin thought the diaper might be important evidence because it would be torn if the dog had bitten through it. He searched through the indicated dumpster but only found one diaper, which was not of the kind appellant used and had no tears or blood on it.

Dr. Kevin Lally, a pediatric surgeon who operated on the child on March 13, 2007, described the nature of the child's injuries and the treatment provided. In his testimony, he referenced several photographs,

---

1. At trial, this line of questioning was subject to a hearsay objection and will consequentially be discussed in more detail below.

exhibits 40 through 45, taken of the child's injury.[2] Lally concluded that the child's injury had been caused by "a large, sharp instrument," but he could not say with specificity what kind of instrument it was. He did not believe that a dog could have inflicted such an injury because of the size, straight edges, and square shape of the wound. He said that he had seen hundreds of dog bites in his practice. He further explained that the child's injury presented a substantial risk of death and would leave him permanently disfigured.

Patches Deshazo, Camden Gothia's sister, testified that she went by the apartment a week after the child's injury occurred to get some items for the child. She noticed at that time that a set of poultry shears was missing from its slot in a butcher block in the kitchen. She later saw the shears in the bathroom, informed the police, and the police retrieved the shears. DeShazo also testified that appellant did not look sober when at the hospital on March 13, 2007.

Dr. David Rundel, a BARC veterinarian, testified that he examined and observed Shorty beginning on March 13, 2007. He did not see any blood on the dog's teeth, nails, or coat. Rundel explained that dog bites typically display a "serrated or . . . scalloped pattern" because their teeth are curved. He further stated that dogs leave a "ripping or tearing type of wound" in a "shred[ed] or very irregular-type pattern." Shown photographs of the child's injury in this case, Rundel opined that the wound was not caused by a dog bite because the edges were "just too precise and straight." Stool samples and nail clippings from Shorty were collected for DNA testing.

Cleva West with the Houston Police Department Crime Laboratory testified that the stool samples from Shorty tested negative for human DNA. One of several sets of nail clippings tested positive for blood, but the lab was unable to determine with certainty that it came from the child. West stated that 1 in 3,000 male Caucasians would be a match for the sample. She further testified that a set of knives, a knife block, poultry scissors, a garbage disposal, and a section of pipe, all of which another witness testified were collected from appellant's apartment, tested negative for blood. Jennifer Watson, a Department of Public Safety DNA analyst, testified that she retested the garbage disposal and pipe, and they again tested negative for human blood. She opined, however, that running hot water through a garbage disposal and pipe for over five minutes would probably wash away any blood in them.

Dr. Andrea Stolar, a psychiatrist, explained that cocaine causes "intense euphoria," Xanax is disinhibiting, and if you combine the two, you get unpredictable and potentially aggressive behavior. There was also evidence that a urine sample taken from appellant on March 14, 2007, tested positive for cocaine.

Appellant called only one witness: Dr. Lore Hoag, a veterinarian who runs a behavioral medicine clinic for animals. She testified that she examined photographs of the child's injury and of Shorty's mouth and did not believe that it was impossible for the dog to have caused the child's injuries. She speculated that the dog could have been exhibiting a feeding rather than an attacking behavior; thus, it would have used its teeth differently and could have rendered a straight edge to the sides of the wound. She also identified

---

**2.** These exhibits were objected to on the ground that they were unduly inflammatory. They will be discussed in greater detail below.

photographs of other dog bite wounds that had "relatively straight and precise" edges. On cross-examination, Hoag acknowledged that she was being paid for her testimony, she does not practice medicine on humans, and she is not an expert on soft-tissue injuries.

In rebuttal, the State called Dr. Heidi Hottinger, a soft-tissue veterinary surgeon. She opined that it was "highly improbable" that a small dog like Shorty could have inflicted the wound suffered by the child. She acknowledged that a dog can cause straight-edged wounds but that it would have taken a lot of time and particular types of effort. She also acknowledged that a dog could be attracted by feces in a diaper.

■ Appellant's defense at trial focused on the possibility that the dog caused the child's injuries. However, there was little evidence implicating the dog as the culprit. Appellant told various people she woke to find the dog standing over or licking the child's groin area, but the jury could easily have dismissed these self-serving comments. A small amount of blood was found on one set of nail clippings from the dog, but testing could not verify that it was from the child, and even if it was, such evidence does not show that the dog played a role in causing the injury. Numerous witnesses testified that they did not see blood on the dog shortly after the injury occurred, and the dog's feces tested negative for human DNA. Several physicians and veterinarians excluded the dog as a possible cause of the injury, and several instead insisted that a sharp instrument of some sort caused the injury. The record therefore supports the jury's rejection of the dog as the culprit.

Evidence established that appellant was left alone with the child, that she had quarreled with the child's father about whether to have the child circumcised, and

that she had taken cocaine and Xanax while having the child in her care the day before the offense. Such evidence supports the conclusion that she had motive and opportunity and may have taken substances that lowered her inhibitions and led to unpredictable, aggressive behavior. Numerous witnesses after the injury occurred observed behavior by appellant which the jury could have interpreted as uncaring and unconcerned regarding the child's welfare. In sum, there was ample evidence to support the jury's conclusion that appellant caused the injuries to the child. We overrule appellant's first two issues.

### Deadly Weapon

In her third issue, appellant challenges the legal sufficiency of the evidence to support the jury's finding that she used a deadly weapon, specifically an unknown "sharp object," in committing the offense. In its charge, the court defined "deadly weapon" as "anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily jury; or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *See* Tex. Penal Code § 1.07(17).

■ In support of her assertion that the evidence was insufficient to support the deadly weapon finding, appellant emphasizes that (1) no weapon or instrument was ever found or specifically identified, (2) there was no testimony regarding the precise nature of the alleged weapon used, and (3) there was conflicting testimony regarding what caused the child's injuries. While appellant is correct that the deadly weapon was not specifically identified or found, neither is a requirement for a deadly weapon finding. *See Regan v. State,* 7 S.W.3d 813, 819–20 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd). Substantial

evidence supported the conclusion that something very sharp inflicted a life-threatening and permanently disfiguring and disabling injury on the child. Therefore, the instrument in question, in the manner of its use, was capable of causing death or serious bodily injury as required for a deadly weapon finding. *See* Tex. Penal Code § 1.07(17).

The evidence included testimony from the doctors who treated the child's injuries and opined regarding the severity of the injuries as well as the sharpness of the instrument that caused the injuries. The evidence also included photographs of the child's injuries, which showed rather straight cuts in the skin. While appellant's expert opined that a dog may have caused the injuries, this possibility was disputed by several of the State's witnesses, and the jury was entitled to resolve any such conflict in the evidence. *See Williams v. State,* 301 S.W.3d 675, 684 (Tex.Crim.App.2009). The evidence was sufficient to support the jury's deadly weapon finding. We overrule appellant's third issue.

### Photographs

■■■ In her fourth issue, appellant contends that the trial court erred in admitting into evidence seven photographs, six of the child's injuries (exhibits 41 through 46) and one taken at the crime scene (exhibit 61). Appellant specifically contends that the photographs were unduly inflammatory and duplicative. Under Texas Rule of Evidence 403, a photograph is admissible if it has probative value and that probative value is not substantially outweighed by the photograph's inflammatory nature. Tex.R. Evid. 403; *Williams,* 301 S.W.3d at 690. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial."

*Shuffield v. State,* 189 S.W.3d 782, 787 (Tex.Crim.App.2006). Analysis under the rule should generally consider: (1) how probative the evidence is, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way, (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Id.*

■■■ A variety of factors may be relevant in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, including: the number of photographs offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up images, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case. *Williams,* 301 S.W.3d at 690. The admissibility of photographs over an objection is within the trial judge's sound discretion. *Id.*

The seven photographs at issue here were all in color and 8 ½″ × 11″ in size. Exhibits 41 through 46 showed the child's injury and were all taken at the hospital. They were admitted during the testimony of Dr. Lally, who referenced the photographs in discussing the nature of the injury and the treatment performed. He also referenced the photographs in offering his opinion that the injury had been caused by "a large, sharp instrument" and not a dog. He based his opinion on the size, straight-edges, and square shape of the wound. The exhibits included images of different specific areas of the child's injury and of differing degrees of closeness, and some were taken at different times. The child is unclothed in the photographs.

■■■ As discussed above, a key issue raised in the case was whether the

child's injury could have been inflicted by a small dog or whether it was caused by a sharp instrument in the hands of a person. The photographs of the child's injury were particularly important for the jury in understanding the testimony offered by Dr. Lally and for forming their own conclusions regarding the cause of the injury. Although the photographs depict a gruesome injury, they "portray no more than the gruesomeness of the injuries inflicted" on the child. *Williams,* 301 S.W.3d at 691. In short, the probative value of the photographs was not substantially outweighed by their inflammatory nature. Furthermore, given the varying subject matter of the individual photographs and their individual use during Lally's testimony, the photographs were not unduly duplicative. *See id.* at 691–92 (finding trial court did not abuse its discretion in admitting several photographs depicting injuries of murder victims). The trial court did not abuse its discretion in admitting exhibits 41 through 46.

 Exhibit 61 is a photograph taken at the crime scene, showing a blood stain on a bed sheet. When this photograph was offered into evidence, however, appellant's trial counsel stated that he had "no objection." Any error in admitting this exhibit was therefore waived. *See Holmes v. State,* 248 S.W.3d 194, 201 (Tex.Crim. App.2008) ("[A] defendant waives any complaint on appeal concerning the admissibility of evidence when he affirmatively states, No objection,' at the time the evidence is offered...."). Finding no merit in any of appellant's arguments regarding the admission of photographic evidence, we overrule appellant's fourth issue.

*Hearsay*

In issue six, appellant contends that the trial court erred in admitting hearsay testimony from Ladonya Davis.[3] Davis was the animal control officer who was present at the apartment complex when Camden Gothia first arrived on the scene. She said when Gothia rushed into the apartment and asked what was going on, appellant told him that the child had been bitten by the dog and was now at the hospital. Davis said that Gothia went into the bedroom and began "crying and screaming" and fell to the floor. Gothia then sat on a mattress in the dining or kitchen area. Appellant sat beside him and told him "it was all a part of growing up." When the prosecutor then asked Davis how Gothia responded, defense counsel stated a hearsay objection that was sustained. In response to the prosecutor's questions about Gothia's demeanor at that point, Davis described him as "very excited" and "[v]ery upset." The prosecutor then again asked Davis how Gothia responded to appellant's statement, and defense counsel again objected on hearsay grounds. After a discussion at the bench, in which the trial judge clarified that counsel was objecting to testimony regarding what Gothia said and not regarding what appellant said, the judge overruled the objection. Davis then testified that after appellant's comment about "growing up," Gothia said "a child growing up is not a part of getting his stomach ate out [*sic* ]."

 Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex.R. Evid. 801(d). Hearsay is generally inadmissible unless it fits into a statutory or rule-based exception. *See*

**3.** We address issue six before issue five because as will be seen, our resolution of issue six impacts our analysis of issue five.

Tex.R. Evid. 802. We review a trial court's determination of whether evidence is admissible under an exception to the hearsay rule for an abuse of discretion. *Wall v. State,* 184 S.W.3d 730, 743 (Tex. Crim.App.2006). One exception to the rule is provided for "excited utterances," which are defined as "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tex.R. Evid. 803(2); *Salazar v. State,* 38 S.W.3d 141, 154 (Tex.Crim.App.2001). The reasoning behind the excited utterance exception is a psychological one: when a person is in the instant grip of violent emotion, excitement, or pain, that person ordinarily loses capacity for the reflection necessary for fabrication, and the truth will come out. *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex.Crim.App.2003). In other words, the statement is trustworthy because it represents an event speaking through the person rather than the person speaking about the event. *Id.; Ricondo v. State,* 475 S.W.2d 793, 796 (Tex. Crim.App.1971).

In determining whether a hearsay statement is admissible as an excited utterance, the court may consider as factors the time elapsed and whether the statement was in response to a question. *Salazar,* 38 S.W.3d at 154. The focus, however, must remain on whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event at the time of the statement. *Id.* In short, a reviewing court must determine whether the statement was made "under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *Fowler v.*

*State,* 379 S.W.2d 345, 347 (Tex.Crim.App. 1964).

Here, even assuming that the statement in question was hearsay (*i.e.,* an out of court statement offered to prove the truth of the matter asserted), the State clearly presented evidence on which the trial judge could conclude that at the time of making the statement Gothia was dominated by the emotions, excitement, fear, or pain of a traumatic event: learning his child was at the hospital because of a reported dog bite. Davis testified that Gothia was screaming and crying and had collapsed to the floor shortly before making the statement. In light of this evidence, the trial court did not abuse its discretion in overruling the hearsay objection. We overrule issue six.

### *Allegations of Misconduct*

In her fifth issue, appellant asserts that the prosecution engaged in a pattern of misconduct that denied her a fair trial. Specifically, she alleges that prosecutors: (1) violated the motion in limine by introducing evidence of her prior drug use, (2) improperly sought to elicit hearsay evidence from witness Ladonya Davis, (3) improperly questioned a witness about appellant's arrest and about testimony from a Child Protective Services hearing regarding the child, and (4) made numerous improper arguments to the jury.

We begin by pointing out that except for the contentions regarding improper jury argument, appellant provides neither citations to legal authority nor cogent legal analysis regarding her other contentions of misconduct. Therefore, we consider only the contentions regarding improper argument. *See* Tex.R.App. P. 38.1(i).[4]

---

4. Appellant did sufficiently brief her hearsay contention under issue six. However, as explained above, there was no error in the admission of the statement in question; thus, there could be no misconduct in offering that testimony.

 Jury argument by the State is generally considered permissible if it falls within one of the following categories: (1) summation of the evidence adduced at trial; (2) reasonable deductions from that evidence; (3) answer to argument of defense counsel; and (4) pleas for law enforcement. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex.Crim.App.2000). Even when an argument lies outside these approved areas, it will not result in reversal unless, in light of the record as a whole, it is "extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding." *Id.* For reversal to be warranted, the remarks must have constituted a willful and calculated effort to deprive appellant of a fair and impartial trial. *Id.* In most instances, an instruction to disregard the remarks will cure the error. *Id.*

 The preferred method of preserving error on improper jury argument grounds is to (1) object to the argument in a timely manner, (2) request an instruction to disregard, and (3) move for mistrial, if the instruction to disregard seems insufficient. *Cruz v. State*, 225 S.W.3d 546, 548 (Tex.Crim.App.2007). A request for an instruction to disregard is essential to the preservation of error only when such an instruction could have had the intended effect. *Id.* If such instruction would not have been effective, then error can be preserved by a motion for mistrial. *Id.* A defendant's failure to object to a jury argument or to pursue to an adverse ruling his objection to a jury argument forfeits his right to complain about the argument on appeal. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex.Crim.App.1996).

 Here, of the nine alleged instances of improper argument appellant identifies in her brief, she acknowledges having properly preserved error on only two.[5] The first occurred when the prosecutor described appellant's trial counsel as being "very good lawyers [just] doing their jobs" but then said "[i]t's time, though, for them to move away so that you can judge her. It's time to stop hiding behind the lawyers." Defense counsel objected to these remarks as "striking at the defendant over the shoulders of her counsel." Counsel then requested the jury be instructed to not consider the comments, and the trial court did as requested.

The second preserved argument occurred when the prosecutor was discussing an incident that defense counsel had recounted as having happened to him. The prosecutor stated, "It sounds like he relates to [appellant], which there's a whole nother story there." Defense counsel again objected that this struck at appellant over her lawyer's shoulder. The trial court sustained the objection and instructed the jury to disregard the comments. After the jury was instructed to disregard in each instance, counsel requested a mistrial, which the court denied.

 Assuming that the prosecutor's comments were in fact improper, we turn to the question of harm. As the Court of Criminal Appeals has explained:

> There are three factors to consider when assessing the impact of the harm arising from jury argument error: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of convic-

---

5. The seven alleged instances for which appellant acknowledges that error was not preserved are discussed in more detail below in regards to appellant's ineffective assistance of counsel complaint.

tion absent the misconduct (the strength of the evidence supporting the conviction).

*Berry v. State*, 233 S.W.3d 847, 858–59 (Tex.Crim.App.2007).

Neither statement here was egregious. The first was a rather generic suggestion that appellant could not hide behind her lawyers, and the second was an aside which was relevant to nothing in the case. Neither was likely to have had much of an impact on the jury. In light of the nature of the remarks, the trial court's instruction to disregard was probably effective to cure the misconduct. Furthermore, as described in detail above, the case against appellant, although circumstantial in nature, was a strong one. Accordingly, appellant was not harmed by the prosecutor's argument. We overrule the fifth issue.

### Assistance of Counsel

 In her seventh issue, appellant contends that she received ineffective assistance of counsel because counsel failed to properly object in regards to the admission of a particular photograph and the State's allegedly improper jury arguments. The Sixth Amendment to the United States Constitution guarantees the right to reasonably effective assistance of counsel in criminal prosecutions. U.S. Const. amend. VI; *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). In reviewing an ineffective assistance claim, an appellate court "must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance; that is, [appellant] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Under the two-pronged Strickland test, in order to demonstrate ineffective assistance of counsel, a defendant must first show that counsel's performance was deficient, *i.e.*, that his assistance fell below an objective standard of reasonableness; second, a defendant must affirmatively prove prejudice by showing a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App.1999). Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Id.* at 813. Appellant bears the burden of proving by a preponderance of the evidence that counsel was ineffective. *Id.* To establish ineffective assistance of counsel based on a failure to preserve error, an appellant must demonstrate that the trial court would have been found to have committed harmful error had the issue been preserved for appellate review. *Alexander v. State*, 282 S.W.3d 701, 705 (Tex. App.-Houston [14th Dist.] 2009, pet. ref'd).

 Appellant first complains that defense counsel failed to object to photographic exhibit 40.[6] Exhibit 40 showed an image of the child's injury. It was one of a small group of photographs used by Dr. Lally to explain the injury, the treatment, and his conclusion that the injury was caused by use of a sharp instrument and not by a dog. As we discussed above under issue four, the trial court did not err in admitting the rest of this group of photographs into evidence over defense coun-

---

**6.** It appears from the record that defense counsel did object at one point to exhibit 40 but failed to get a specific ruling on that objection and failed to later renew the objection.

sel's objections. For the reasons given above, we further conclude that the court would not have erred in admitting this photograph; thus, a claim of ineffective assistance cannot be premised on the failure to object to admission of exhibit 40. Furthermore, isolated failures to object are typically not sufficient grounds for a finding of ineffective assistance. *See Green v. State*, 191 S.W.3d 888, 895 (Tex. App.-Houston [14th Dist.] 2006, pet. ref'd) (citing *Ingham v. State*, 679 S.W.2d 503, 509 (Tex.Crim.App.1984)).

 Appellant has also identified seven alleged instances of improper jury argument which were not preserved for appellate review. We begin by noting that other than stating generally that the prosecutor's statements were "either misstatements or clearly not proper," appellant provides no analysis of the individual statements and no explanation as to why she believes each to have been improper. Therefore, we do not address them further. *See* Tex.R.App. P. 38.1(i).

 Furthermore, appellant has failed to meet her burden of establishing that counsel was ineffective. The seven identified statements, as well as defense counsel's and the trial court's actions in regards to each, were as follows:

- Prosecutor indicated that Camden Gothia testified that he had cancelled a circumcision appointment for the child. Defense counsel objected that this statement was contrary to the record, and the trial court instructed the jury members that they were the fact-finders and arguments by the lawyers did not constitute evidence.

- Immediately thereafter, the prosecutor stated that a circumcision appointment had been cancelled "within the last few days" before the child's injury occurred. Counsel again objected that this was outside the record. The trial court took no action.

- Prosecutor made comments about a CPS worker crawling into a dumpster looking for the child's diaper in every trash bag. Counsel objected that this was outside the record, and the trial court again instructed the jury that they were the fact-finders and argument of counsel was not evidence.

- Prosecutor stated regarding the case presented by the defense: "I don't think they think it went very well." Defense counsel objected to the prosecutor's "testifying and putting her own credibility behind her statements." The trial court sustained the objection.

- Prosecutor suggested that appellant had to be pushed into the ambulance with the child. Counsel objected that there was no evidence of this, and the court again instructed the jury that they were the fact-finders and the lawyer's statements were not evidence.

- Prosecutor stated that had she thought a dog had attacked her child, she "would have thought more than once about throwing that dog up against the wall … but I dare say I wouldn't have touched that dog." Defense counsel objected that it was improper for the prosecutor "to testify to what she would do," and the trial court sustained the objection.

- Prosecutor stated that on the day the injury took place, Adam Windsor saw appellant and thought she looked "wired." The prosecutor then said, "And I bet he knows what wired looks like, don't you? I mean, that's the kind of people she gravitates to." Defense counsel objected that this was outside of the evidence, and the trial judge said, "Same instruction, ladies and gentlemen."

Appellant complains that although defense counsel objected to each of these purported instances of improper argument, counsel did not pursue each objection sufficient to preserve any error for appellate review. However, as this issue was not developed in proceedings on a motion for new trial, the record is silent as to why counsel chose not to pursue the objections further. On such a silent record, this court can find ineffective assistance of counsel only if the challenged conduct (here, the failure to preserve any error) was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim.App.2005). The record reveals that defense counsel made numerous objections and obtained numerous instructions to the jury during the prosecutor's closing argument. Counsel may have concluded that to push harder than he did would have been futile and might have drawn unwarranted attention to the prosecutor's statements. *See Brennan v. State*, 334 S.W.3d 64, 76–77 (Tex.App.-Dallas 2009, no pet.). This conduct was not so outrageous that no competent attorney could have engaged in it. Consequently, appellant has not met her burden of demonstrating deficient representation as required under the first prong of *Strickland*. *See Thompson v. State*, 9 S.W.3d at 812. We overrule appellant's seventh issue.

Having overruled each of appellant's issues, we affirm the trial court's judgment.