**Affirmed and Memorandum Opinion filed May 9, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-22-00231-CR

---

**PHILLIP RECIO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 185th District Court
Harris County, Texas
Trial Court Cause No. 1679574**

---

## M E M O R A N D U M   O P I N I O N

A jury found Appellant Phillip Recio guilty of continuous sexual abuse of a child and the trial court assessed punishment at 25 years' confinement. Appellant raises a single issue on appeal and asserts that he received ineffective assistance of counsel at trial. For the reasons below, we affirm.

### BACKGROUND

Appellant married Complainant's Mother in July 2014. After the marriage,

Appellant and Mother moved in together, along with nine-year-old Complainant and her two brothers.

In September 2018, Complainant made an outcry of sexual abuse to her Father and Stepmother. Appellant was arrested and charged with continuous sexual abuse of a child. *See* Tex. Penal Code Ann. § 21.02. Appellant proceeded to a jury trial in February 2022.

## I.    Evidence at Trial

The jury heard testimony from ten witnesses at trial; six presented by the State and four presented by Appellant. Relevant portions of their testimonies are summarized below.

### *Stepmother*

Stepmother testified that she was concerned about certain text messages sent from Appellant to Complainant in the summer of 2016, when Complainant and her brothers were staying with Father. Photographs of these text messages were admitted into evidence.

Stepmother characterized the text messages as "flirtatious." In the messages, Appellant repeatedly asked Complainant to send him pictures of her; told Complainant he "miss[ed]" her and "wish[ed] [she] were here snuggling" with him; told Complainant they could "cuddle and watch a movie" when she got home; and told Complainant that he loved and missed her. Stepmother thought the messages were "unusual" and showed them to Father, Paternal Grandmother, and Maternal Grandmother. Stepmother said Maternal Grandmother was dismissive of the messages and believed that Appellant was "just . . . trying to be a loving dad."

Stepmother said she and Father did not report the text messages to authorities but chose instead to monitor Complainant. Stepmother recalled that the

2

text messages eventually "kind of died down." Stepmother agreed that, for approximately two years after the text messages, she "did not see anything that alarmed" her. According to Stepmother, the only "suspicious" thing she noted was that Complainant was "pulling away and not being as outgoing as she was."

In September 2018, Complainant and her brothers were staying with Father and Stepmother for the weekend. Stepmother recalled that the children were "complaining" and did not want to return to Mother's house. Stepmother said the children inquired as to how they could have custody changed from Mother to Father.

According to Stepmother, Father proceeded to question Complainant about the text messages she had received from Appellant two years earlier. Stepmother recalled asking Complainant if Appellant had "touched [her] in any inappropriate way," to which Complainant responded by crying and "curl[ing] up into a ball." Stepmother said Mother and Maternal Grandmother were informed of Complainant's outcry.

### Father

Father also recalled seeing the "unusual" text messages sent from Appellant to Complainant in the summer of 2016. After discussing the messages with Stepmother, Paternal Grandmother, and Maternal Grandmother, Father said the decision was made "to not go forward with anything, that it really wasn't bad enough, that it [sic] just, red flag, something's going on here. It's just something to keep an eye on."

According to Father, Complainant and her brothers were visiting him and Stepmother for a weekend in September 2018. Father recalled that the children were "frustrated" and "not happy with homelife [with Mother] in Houston at that

3

point." Father said Complainant "was more withdrawn than usual."

When the children were preparing to return to Houston, Father said Complainant "started acting fidgety and nervous." Father asked Complainant about the text messages she had received from Appellant two years earlier and Complainant "started crying and she said that she couldn't speak of it because he said he would hurt people." Father said Complainant told them she had been sexually abused by Appellant.

### *Claudia Hauser*

Hauser is a forensic interviewer employed at the Children's Assessment Center. Hauser interviewed Complainant in October 2018 regarding the sexual abuse allegations. Hauser said Complainant was "very reluctant" to talk, was "very quiet," and "wasn't answering any of [her] questions." Eventually, Complainant began to share the details of the abuse. Hauser opined that Complainant's behavior was consistent with a child that had been sexually abused.

### *Susan Camazine*

Camazine is the sexual assault nurse who examined Complainant in October 2018. According to Camazine, Complainant was "withdrawn, very quiet, she was trembling throughout our time together, she was tense, fidgeting, very anxious, she was constantly looking down to the floor, wringing her hands, [and] tapping her feet."

Camazine said she was unable to complete Complainant's genital examination because Complainant "was not in an emotional place to allow me to do that exam." Camazine testified that, in her experience, patients "very seldom" refused that portion of the exam.

*Complainant*

Complainant said she first met Appellant when she was nine years old. According to Complainant, the first "inappropriate" interaction with Appellant occurred when she was laying on the couch next to him watching a movie and he touched her waist and thighs.

Complainant said other incidents with Appellant occurred in his bedroom. On one occasion, Complainant recalled that Appellant had her take off her pants so he could rub Neosporin into chigger bites on her "groin area." Complainant recalled other incidents where Appellant would touch her "breast, [] butt, [] thighs, [and] waist." In exchange for this contact, Complainant said Appellant would "treat [her] better" than her brothers and "offer [her] things, like candy or, at one point, cats." Complainant said these interactions would regularly occur throughout the time she lived with Appellant.

Complainant testified that Appellant made her watch the movie "The Secretary," which portrayed a "completely obedient" woman. Complainant said Appellant told her she "should be more like the woman portrayed in the movie."

Complainant also discussed the September 2018 weekend spent with Father and Stepmother, at which she made the sexual abuse outcry. On the drive from Houston to her Father's house, Complainant recalled that she was "upset" because Mother and Appellant "took [her] phone." Complainant said her brothers had their phones taken away, too.

On the Sunday she was supposed to return to Houston, Complainant said her Father and Stepmother asked her if Appellant had sexually abused her. In response, Complainant said she "didn't say anything to them" and only "nodded." Mother came to the house the next day and Complainant told her she had been

5

inappropriately touched by Appellant.

### *Dr. Crowson*

Dr. Crowson is a clinical psychologist and watched Complainant's October 2018 forensic interview from an adjacent room. Dr. Crowson noted that Complainant exhibited certain behaviors, including "avoidance, withdrawal, [and] trying to detach from the situation." Reviewing the text messages admitted into evidence, Dr. Crowson opined that they suggested "grooming in the sense that there was encouragement of secrecy, [and] forced affection and threats if she wasn't responding in a quick enough manner."

### *Connie Recio*

Connie Recio is Appellant's mother. Connie said she lived with Appellant, Mother, Complainant, and Complainant's two brothers for one-and-a-half years starting in February 2017. During this time, Connie said Appellant was employed as a railroad car technician and would work either the second shift (3:00 p.m. to 11:00 p.m.) or the third shift (11:00 p.m. to 7:00 a.m.). Connie said she was generally at the house "[a]ll the time" since she had recently retired.

Connie said her bedroom was on the house's second floor and shared a Jack-and-Jill bathroom with Complainant's bedroom. Connie recalled that the bathroom's doors were generally kept open so she could monitor whether Complainant was using her tablet "after it was bedtime."

During her time living with the family, Connie said she did not see Complainant exhibit any behavior suggesting Complainant "was either unhappy or [] felt threatened or that she was scared in any way." From what she observed, Connie said it appeared Appellant "was a good father to the kids that were in that house." Connie said she did not see anything to substantiate Complainant's sexual

6

assault allegations.

## Maternal Grandmother

Maternal Grandmother recalled visiting Appellant, Mother, and the three children at their Houston home. When asked if she had observed unusual behavior while visiting the family, Maternal Grandmother said she "never saw [Complainant] uneasy, you know. I never did see her act like anything was, you know, going on or inappropriate." According to Maternal Grandmother, she thought Appellant had a "good relationship" with Complainant and that he was "always supportive of all three kids."

## Mother

At the time of trial, Mother said she had not seen Complainant in over three years because of a court order. Mother said she married Appellant in 2014 and, afterwards, the family moved in together. Mother said her children "loved" Appellant and "were crazy about him." Mother said Father never notified her of the 2016 text messages sent from Appellant to Complainant.

Mother also was questioned regarding the September 2018 weekend when Complainant made the sexual abuse outcry while visiting Father and Stepmother. At that time, Mother said all three children "had lost their phones . . . because their grades had started slipping." Mother also recalled that Complainant "had a big English project that was due that Monday" but had "been putting it off." Mother said that, because Complainant had not completed her English project, she "was threatened to lose her little Pet Shops and her Animal Jam account which was everything to her at that point." Describing Complainant as "very angry," Mother said she did not know if she had ever seen Complainant as "angry as she was at that moment."

Mother said she was on her way to pick up the children from Father's house when Father called her regarding the outcry; Mother said she was "in shock" and "couldn't even concentrate on driving." Mother immediately returned to Houston, removed her stuff from the house she shared with Appellant, and went to Maternal Grandmother's house. Mother said she went to Father's house the next day to talk to Complainant.

When she arrived at Father's house, Mother said Paternal Grandmother initially kept her "from talking by [her]self" to Complainant. According to Mother, Paternal Grandmother said she "want[ed] to make sure that [Complainant] tells you the same thing that she told to us." When asked if "anything unusual" happened at Father's home that made her "concerned" about Complainant's outcry, Mother said "yes" and recalled hearing Complainant and her half-sister "laughing in the bedroom" before Complainant came outside. Mother said the girls "were giggling like little schoolgirls."

A few days later, Mother said Complainant had a forensic interview at the Children's Advocacy Center. Complainant's siblings also attended the interview. Mother said she thought their "demeanor" was inappropriate "the entire time" and stated:

> Well, I mean, I — I'm sitting there worried about my children by myself, crying my eyes out, wondering what's going on with them as our life was crumbling and they were sitting over there on their cell phones, looking and scrolling through Facebook and laughing and talking about where they were going to go eat when they left.

At this time, Mother said Father was paying her $1,200/month in child support and stopped sending payments approximately two weeks after Complainant's outcry. Mother said she was currently paying Father $1,050/month in child support.

Mother said she never saw any behavior between Appellant and

8

Complainant that caused her concern about any inappropriate conduct. Mother said she did not believe Complainant's allegations.

*Appellant*

When asked about the 2016 text messages he sent Complainant, Appellant recalled that he and Mother had been having trouble with one of Complainant's brothers. Appellant said Complainant's brother was not allowed to use her phone and, when Appellant asked Complainant to send pictures, he was confirming that Complainant was the person using the phone.

Appellant said he never touched Complainant inappropriately.

After the close of evidence, the jury deliberated and found Appellant guilty of continuous sexual abuse of a child. The trial court assessed punishment at 25 years' confinement.

## II. Post-Judgment Proceedings

Appellant filed a motion for new trial and asserted that he received ineffective assistance of counsel at trial. The State filed a motion to recuse the trial judge, pointing to certain comments the judge made that indicated he "believe[d] this particular defendant to have been wrongly convicted." The motion to recuse was granted.

A hearing was held on Appellant's new trial motion. Appellant's trial counsel testified at the hearing and said he had approximately 300 pending cases at the time of Appellant's trial. Counsel said he was the only one working on Appellant's case.

Counsel acknowledged that he made an "honest mistake" by not viewing the video of Complainant's forensic interview before trial. Counsel noted that Complainant's statements regarding the assault "evolved" from her forensic

interview to trial and stated that "[t]here were certainly additions" to her statement. Counsel also said that he would have been able to observe certain behaviors Complainant exhibited during the forensic interview. Mother, testifying at the hearing, said these behaviors suggested Complainant was lying.

Counsel also testified that he did not hire an investigator and did not call Micah Singleton, one of Appellant's friends, to testify as to Appellant's character. Singleton testified at the hearing and stated that (1) he briefly lived with Appellant and his family, (2) he never noticed any inappropriate behavior between Appellant and Complainant, and (3) in his twenty-year friendship with Appellant, he never noticed that Appellant was attracted to young girls.

The trial court signed an order denying Appellant's new trial motion. The trial court also signed findings of fact and conclusions of law.

## ANALYSIS

Arguing that he received ineffective assistance of counsel, Appellant points to the following alleged deficiencies in his trial counsel's representation:

1. failure to review Complainant's forensic interview before trial;
2. failure to call Singleton as a witness at trial;
3. failure to timely designate Mother as an outcry witness; and
4. failure to preserve error on an improper jury argument.

Because of these deficiencies, Appellant contends, the trial court erred when it denied his motion for new trial.

## I. Standard of Review and Governing Law

When, as here, a defendant asserts ineffective assistance of counsel in a new trial motion, we review the denial of that motion for an abuse of discretion. *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012), *overruled on other grounds*

10

*by Miller v. State*, 548 S.W.3d 497 (Tex. Crim. App. 2018); *Straight v. State*, 515 S.W.3d 553, 564 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). A trial court abuses its discretion when its decision is so clearly wrong as to lie outside the zone of reasonable disagreement. *Webb v. State*, 232 S.W.3d 109, 122 (Tex. Crim. App. 2007). We view the evidence in the light most favorable to the trial court's ruling and will reverse only if no reasonable view of the record could support the trial court's ruling. *Id.*

To prevail on a claim of ineffective assistance of counsel, a defendant must show by a preponderance of the evidence that: (1) trial counsel's performance was deficient because it fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984); *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012).

To determine whether counsel's performance was objectively deficient under the first *Strickland* prong, we look to the totality of the representation and the particular circumstances of the case at the time of trial, ignoring the deleterious effect of "20/20 hindsight." *Jimenez*, 364 S.W.3d at 883. "Because there are 'countless ways' to render effective assistance, judicial scrutiny of the trial counsel's conduct must be highly deferential." *Ex parte Rogers*, 369 S.W.3d 858, 862 (Tex. Crim. App. 2012). We indulge a strong presumption that counsel rendered adequate assistance and acted in furtherance of a sound trial strategy. *Strickland*, 466 U.S. at 689; *Jimenez*, 364 S.W.3d at 883. To overcome the presumption of reasonable professional assistance, an allegation of ineffective assistance must be firmly rooted in the record. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005).

To establish prejudice under the second *Strickland* prong, a defendant must

11

demonstrate a reasonable probability that, but for trial counsel's deficiency, the result of trial would have been different. *Strickland*, 466 U.S. at 687-88. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Cox v. State*, 389 S.W.3d 817, 819 (Tex. Crim. App. 2012). To undermine confidence in a guilty verdict, a defendant must prove that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

## II. Application

We examine individually the alleged deficiencies in trial counsel's representation.

### A. Failure to Review Complainant's Forensic Interview

Several days after her outcry, Complainant underwent a forensic interview at the Child Advocacy Center. Trial counsel did not review the videotape footage of this interview before Appellant's trial.[1] At the hearing on Appellant's new trial motion, trial counsel agreed that this constituted an "inadvertent mistake." Trial counsel testified that Complainant's testimony "evolved" between the forensic interview and trial and noted that her testimony had "additions that were not made when she initially gave her [forensic] interview." Trial counsel also stated that Complainant's demeanor during the interview was notable and testified that, if he had seen the video, he would have been able to introduce testimony from Mother suggesting that Complainant's behavior indicated she was lying.

In its findings of fact and conclusions of law, the trial court made the following findings:

47. Defense counsel Monks made an inadvertent mistake and failed

---

[1] Videotape footage of the interview was not admitted into evidence at trial.

to review the complainant's forensic interview[.]

48. The offense report contains a detailed summary of [Complainant's] forensic interview with the Children's Assessment Center.

49. The State's outcry notice contains a detailed summary of [Complainant's] forensic interview with the Children's assessment center.

50. The summary of [Complainant's] forensic interview contained in the offense report is consistent with the video of her forensic interview and trial testimony.

51. The summary of [Complainant's] forensic interview contained in the State's outcry notice is consistent with the video of her forensic interview and her trial testimony.

52. Defense counsel Monks reviewed the summary of [Complainant's] forensic interview contained in the offense report.

53. Defense counsel Monks reviewed the summary of [Complainant's] forensic interview contained in the State's outcry notice.

54. The trial court finds the State's outcry notice and summary of it in the offense report was almost a verbatim account of the interview, however, only by viewing the CAC interview would counsel have had sufficient knowledge of the complainant's demeanor during the interview.

The trial court also made the following legal conclusion:

Defense counsel's performance was deficient by failing to watch [Complainant's] CAC interview. However, based on the totality of the representation, Defendant has failed to demonstrate that a reasonable probability exists that the result of the proceeding would have been different absent counsel's failure to watch the CAC interview.

We agree with the trial court's conclusion regarding prejudice: the record does not show a reasonable probability that, but for trial counsel's failure to review the forensic interview, the result of trial would have been different. *See id.*; *Cox*, 389

13

S.W.3d at 819.

Appellant asserts that reviewing the forensic interview would have permitted trial counsel to question Complainant on the following points: (1) her statement in the forensic interview "to the effect that she <u>now</u> knew that [Appellant] wanted naked pictures of her," which was "indicative that someone had educated or suggested that idea" to Complainant; (2) "inconsistencies" between Complainant's forensic interview and her trial testimony; and (3) "details" that Complainant mentioned at trial but failed to discuss during her forensic interview. But eliciting testimony on these points likely would not have changed the jury's verdict. *See Strickland*, 466 U.S. at 695.

First, Complainant testified at trial regarding Appellant's alleged request for naked pictures:

COUNSEL: What kind of things would [Appellant] ask for?

COMPLAINANT: Pictures of myself.

COUNSEL: Would you send him pictures?

COMPLAINANT: Yes, sir.

*        *        *

COUNSEL: . . . . What would you call — what would you refer to those pictures as? So if you're to tell your friends to send you a picture like that, what would you call that? What do people your age call those things?

COMPLAINANT: He would ask — he would just ask me to send him pictures of myself and sometimes they would be normal photos, sometimes they would be inappropriate photos.

14

COUNSEL:                What would be inappropriate about them?

COMPLAINANT:        Well, first I would send him normal photos of myself and sometimes he would tell me that he knew what — like he would say that, "You know what I mean," and he would be upset with me until I sent him photos without my clothes on.

This line of questioning counsels against the argument that Complainant's "naked pictures" allegation arose solely from another person's suggestion or coaching. Therefore, even if trial counsel had raised this argument at trial, it likely would not have changed the jury's verdict. *See id.*

Appellant also asserts that watching Complainant's forensic interview would have permitted trial counsel to question Complainant regarding "inconsistencies" and additional "details" in her trial testimony. Specifically, Appellant points out that Complainant did not mention the following in her forensic interview: (1) Appellant made her watch the movie "The Secretary"; (2) Appellant touched Complainant "while they were sitting on a couch together"; (3) Appellant "rubbed Neosporin into the Complainant's groin area to treat chigger bites"; and (4) Appellant pulled Complainant's hair to force her to look back at him.

But viewing Complainant's forensic interview and trial testimony more generally, the substance of her statements is consistent. Compared to the broader nature of Complainant's substantive allegations, questioning Complainant regarding these tangential details likely would not have changed the jury's guilty verdict.

Appellant also contends that viewing the forensic interview would have permitted trial counsel to introduce testimony from Mother suggesting that Complainant's behavior during the interview indicated she was lying. However, this evidence likely would not have changed the jury's verdict. *See id.* The jury

15

heard similar evidence from Mother, who testified that Complainant's behavior at certain points made her doubt the veracity of Complainant's allegations. Specifically, Mother testified that (1) she overhead Complainant "giggling" with her half-sister before she came outside of Father's house and told Mother about the alleged sexual abuse; and (2) Complainant's behavior before her forensic interview was "inappropriate" in light of the situation. Accordingly, additional evidence on this point would not have altered the trial's result. *See Ruiz v. State*, No. 14-15-00285-CR, 2016 WL 4254296, at *4 (Tex. App.—Houston [14th Dist.] Aug. 11, 2016, no pet.) (mem. op., not designated for publication) ("Evidence that is merely cumulative will rarely be judged by trial or appellate courts to bring about a different result.").

Considering all the evidence in the light most favorable to the trial court's ruling, we conclude Appellant did not demonstrate a reasonable probability that, but for trial counsel's failure to watch Complainant's forensic interview, the result of trial would have been different. *Strickland*, 466 U.S. at 687-88. We overrule Appellant's ineffective-assistance argument on this point.

## B. Failure to Present Testimony from a Beneficial Witness

Appellant asserts trial counsel erred by failing to present testimony from Singleton, who knew Appellant for over twenty years and briefly stayed with the family when the alleged sexual abuse occurred. At the hearing on Appellant's new trial motion, Singleton stated that he would have presented the following testimony at trial:

- he knew Appellant for approximately twenty years;
- he never noticed that Appellant had "any sort of inappropriate attraction to young girls";
- he lived with Appellant's family for three months in 2017; and

- he never saw anything inappropriate between Appellant and Complainant.

But because the jury heard similar testimony from other witnesses, eliciting this evidence from Singleton likely would not have changed the jury's verdict. *See Ruiz*, 2016 WL 4254296, at \*4. Specifically, the jury heard the following:

- Connie, Appellant's mother, lived with the family for a year-and-a-half and shared a bathroom with Complainant. Connie testified that she never saw anything to substantiate the sexual assault allegations.

- Maternal Grandmother visited the family and never saw anything inappropriate between Appellant and Complainant. Maternal Grandmother thought Appellant had a "good relationship" with his stepchildren.

- Mother testified that she never saw any behavior that gave her "any kind of concern at all about any inappropriate conduct." Mother stated that she did "not believe [Complainant's] allegations."

Therefore, the evidence regarding Singleton's testimony does not satisfy *Stickland*'s prejudice showing. *See id*. We overrule Appellant's ineffective-assistance argument based on Singleton's testimony.

### C. Failure to Timely Designate an Outcry Witness

The State filed a "Notice of Intention to Use Child Abuse Victim's Hearsay Statement," seeking to offer into evidence the statements made by Complainant to Claudia Aguilar, who conducted the forensic interview at the Children's Advocacy Center. *See* Tex. Code Crim. Proc. Ann. art. 38.072 (procedural requirements to utilize hearsay exception for a child's first statements concerning alleged sexual abuse).

The trial court held a hearing on the motion and heard testimony from Aguilar and Mother. According to Mother, she was on her way to pick up her

children in September 2018 when she received a phone call from Father and Complainant. Mother stated that Complainant told her Appellant "had touched her since we lived on — in The Woodlands and he would touch her nipples, her butt and her girl parts." This phone call was made before Complainant's forensic interview with Aguilar.

At the conclusion of the hearing, the trial court determined that Mother was the first person to whom Complainant made "a discernible statement as to the alleged offense or sex abuse to meet the threshold requirement to be an outcry statement." *See Nino v. State*, 223 S.W.3d 749, 752 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (stating that the article 38.072 hearsay exception applies "to the first adult to whom the complainant makes a statement that in some discernible manner describes the alleged offense"). The trial court denied the State's notice of intent to use Aguilar's testimony regarding Complainant's forensic interview.

Trial counsel then sought to admit at trial Mother's testimony regarding Complainant's outcry. But the trial court held that, because sufficient notice to use the outcry was not provided, the testimony could not be admitted. *See* Tex. Code Crim. Proc. Ann. art. 38.072 § 2(b) (party intending to offer outcry statement must notify adverse party at least 14 days before trial).

On appeal, Appellant contends that trial counsel was ineffective for failing to timely designate Mother as an outcry witness. Appellant asserts that the "vast difference" between the outcry and Complainant's later statements would have changed the outcome of trial.

This argument fails to satisfy *Strickland*'s prejudice prong. *See Strickland*, 466 U.S. at 687-88. If the jurors had heard the specifics of Complainant's outcry to Mother, it is unlikely they instead would have found Appellant innocent of the charged offense. *See id*. First, the outcry was consistent with Complainant's

18

testimony at trial. Second, it is reasonable that Complainant's outcry to Mother would have been less detailed than her trial testimony, particularly since the outcry was made over the telephone and in front of Father.

Therefore, we overrule Appellant's ineffective-assistance claim based on trial counsel's failure to timely designate Mother as an outcry witness.

### D.     Failure to Preserve Error on Improper Jury Argument

Finally, Appellant asserts that trial counsel rendered ineffective assistance by failing to pursue an objection to portions of the State's closing argument that referenced "prejudicial facts that were outside the record."

During her testimony, Mother was questioned by the State about a "rough patch" in her marriage to Appellant. Referencing an interview Mother previously gave to a CPS caseworker, Mother was asked if she told the caseworker "that [Appellant] would show [her] pictures of young girls?" Mother responded: "No, I don't remember telling her that he would show . . . me pictures of young girls." On redirect, Mother explained that Appellant "had shown her pictures of younger women, younger than [her]self" who were in their "early 20s."

During closing argument, the State asserted that Appellant had previously shown Mother pictures "of little girls." Appellant's trial counsel objected to the statement as outside the evidence and the trial court instructed the jury to "remember the testimony that was provided during that cross-examination." On appeal, Appellant contends that trial counsel erred by failing to "pursu[e] his objections to an adverse ruling or requesting a mistrial."

However, this contention was not raised in Appellant's new trial motion or at the motion hearing. When an ineffective-assistance claim is not supported by an evidentiary record, "it is extremely difficult to show that trial counsel's

19

performance was deficient." *Abbott v. State*, 611 S.W.3d 144, 153 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd).

Here, this alleged error does not satisfy *Strickland*'s first prong and does not constitute performance falling below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688. Rather, trial counsel's failure to pursue his objection to an adverse ruling or requesting a mistrial can be construed as part of a reasonable trial strategy. Trial counsel objected to the statements and the trial court instructed the jury to remember the testimony from trial. Given the tangential nature of the challenged statements, trial counsel reasonably could have concluded that this instruction effectively resolved the issues raised by the State's closing argument. *See Casiano v. State*, 462 S.W.3d 174, 177 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("Because jurors are presumed to follow a judge's instructions, an appropriate instruction generally is sufficient to cure improprieties that occur during a trial."). Moreover, due to the nature of the challenged statements, trial counsel may have determined that it would be more beneficial to Appellant's position to not dwell on their nature or emphasize their content to the jury. *See Nadal v. State*, 348 S.W.3d 304, 322 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (rejecting a similar argument, this court held that trial counsel "may have concluded that to push harder than he did would have been futile and might have drawn unwarranted attention to the prosecutor's statements").

We overrule Appellant's ineffective-assistance claim premised on this point. Having overruled all of Appellant's arguments, we overrule Appellant's single issue.

## CONCLUSION

We affirm the trial court's judgment.

20

/s/    Meagan Hassan
        Justice


Panel consists of Justices Zimmerer, Spain, and Hassan.

Do Not Publish — Tex. R. App. P. 47.2(b).