In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-12-00241-CR
_____

CHRISTOPHER MICHAEL BROWN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
Jefferson County, Texas
Trial Cause No. 10-10220

MEMORANDUM OPINION

A jury convicted appellant Christopher Michael Brown of murder and assessed punishment at ninety-nine years of confinement and a fine of $10,000. In two appellate issues, Brown argues that the trial court erred by admitting extraneous offense evidence and permitting the State to "inject appellant's general reputation before the jury as character evidence, when appellant had not placed such reputation [at] issue." We affirm the trial court's judgment.

1

BACKGROUND

Michael Guidry testified that he is incarcerated after being charged with the same murder as Brown and another co-defendant, Isa Lomax. Guidry testified about the shooting involving Lomax and Brown at 1970 East Lucas. Guidry explained that on the day of the shooting he went to the hospital with Lomax to visit Brown's cousin, Cory, who had been shot by an unknown assailant. According to Guidry, Brown was present at the hospital. Guidry learned that Cory was to be treated and released, and Guidry and Lomax went to Cory's grandmother's home on Glasshouse Street. Brown was also present at the Glasshouse residence.

Brown told Guidry who he believed Cory's assailant was, offered to buy Guidry gas, and convinced Guidry to take him to the Lucas house where Brown believed the shooter was located. Guidry testified that the Lucas house was directly across from the Honey Stop, a convenience store. Guidry testified that he stopped at the gas pump at the Honey Stop, and went in to pay while Lomax went across the street to the Lucas house to see if anyone was home. Guidry flagged down an individual named Eddie, and Eddie pulled into the Honey Stop to talk to Guidry and Brown. When Lomax returned from the Lucas residence, he told Brown that a female peeked out the window of the residence but did not answer the door, and Lomax did not see a car at the residence. Eddie told Lomax and Guidry that he knew who lived at the residence. Guidry testified that Brown and

2

Lomax got out of Guidry's truck and approached the Lucas house, after which Guidry heard multiple gunshots.

Guidry attempted to leave, but Lomax and Brown ran back to Guidry's truck. According to Guidry, Brown had a shirt in his hands, and a .40-caliber gun was wrapped in the shirt. Brown instructed Guidry to depart; Guidry dropped Brown off on Glasshouse Street, but before Brown got out of the truck, Brown gave Guidry the gun and told Guidry to "get rid of it." Guidry put the gun in a pillowcase, wrapped it in a trash bag, and later hid the gun "under the back step under the back porch." Guidry testified that Lomax had a .22 caliber gun, which Guidry had previously given to Lomax. Lomax returned the gun to Guidry after Guidry had dropped Brown off. Guidry put this gun with the other gun inside the pillowcase and trash bag. Guidry and Lomax were subsequently arrested and Guidry gave a statement to the authorities about what had transpired, eventually providing the location of the murder weapons and the identity of the shooters. Guidry explained that he did not want to "tell on" Brown because "[s]nitches get stitches." Guidry testified that he did not see Brown again until four or five months later at the Jefferson County Correctional Facility.

Lomax testified that he was currently incarcerated on a pending murder charge, and Brown and Guidry are his co-defendants. Lomax testified that early in the morning on the day of the offense, he learned that Cory had been shot, so he went to Guidry's house and awakened Guidry and Guidry took him to the hospital to see Cory. When

3

Guidry and Lomax arrived at the hospital, they also saw Brown. When Cory was released from the hospital, Guidry and Lomax followed Cory to the Glasshouse residence, and Brown was also there.

Lomax, Guidry, and Brown eventually left in a white truck with Guidry at the wheel. Lomax testified that when they stopped at the Honey Stop, Brown asked Lomax to knock on the door of the Lucas residence and Lomax did so. Lomax testified that Brown told him that someone at the house owed him money, and Brown could not go to the house because the occupants would not answer the door. According to Lomax, no one answered the door of the residence when he knocked, but a woman peeked through the door. Lomax knew the woman as Martisha Landry. Lomax explained that he, Guidry, and Brown eventually drove to the house, and Brown got out and began talking on his cell phone. According to Lomax, Brown got back in the truck, and they returned to the Honey Stop.

Lomax testified that he and Brown again approached the house, and although Lomax did not see Brown with a weapon, Lomax admitted that he had a .22-caliber gun. Lomax saw Landry come outside, after which Brown began shooting the gun while standing in the doorway of the house. Lomax heard multiple rapid gunshots. Lomax saw a man inside the house, and the man was jumping up and down and screaming. Lomax testified that he wanted to run, but he feared that Brown would believe Lomax was going

4

to "tell" and shoot Lomax. According to Lomax, Brown was a member of the Blood gang.

Lomax testified that after Brown shot the man, he told Lomax to come with him, and the two men got into Guidry's truck and left the scene. Lomax saw Brown holding a white towel, and when asked what was inside the towel, he testified, "I guess it was the gun that [Brown] was shooting." According to Lomax, Brown told Guidry to get rid of the gun. Lomax testified that they took Brown back to Glasshouse Street. Lomax testified that after his arrest, he gave three different statements to the police because he feared that Brown, who was on the run, might harm Lomax's family in retaliation. Lomax also explained that when he was incarcerated with Brown, Brown "told me that I was a snitch. He was going to pay somebody to do me something and other things like that." Defense counsel did not object. Lomax further explained, "I didn't want my family [at] risk knowing that [Brown] had just killed somebody, sir[,]" and Lomax explained that he conveyed his fear of Brown to detectives. Defense counsel did not object.

Edward Godfrey testified that on the day of the offense, Guidry flagged him down as he was driving past the Honey Stop. Godfrey testified that Guidry was driving a white dually truck, and Guidry was pumping gas at the Honey Stop. According to Godfrey, Lomax had approached a house belonging to Godfrey's cousin, Landry. Godfrey

5

explained that the house was directly across the street from the Honey Stop. Godfrey eventually saw Lomax return to the truck Guidry was driving.

At some point, Godfrey became suspicious of the situation and concerned about Landry's welfare, so he returned to Landry's house, pulled into her driveway, and entered the house where Landry and her boyfriend, the victim, were staying. Godfrey and Landry eventually went to Godfrey's car for a cigarette, and Godfrey subsequently saw Brown and Lomax approach the house. Godfrey testified that he did not see anything, but he heard multiple gunshots when he saw Brown go to the front door of the house. Godfrey pulled away from the house with Landry in the backseat of his truck. Landry jumped out of the truck and ran back toward her house, and Godfrey drove to his fiancee's house. When asked whether he told the police that he knew who approached Landry's house, he testified, "No, I did not. . . . Man, stitches. It ain't what's happening in the neighborhood. I wasn't going to tell them. . . . Because by me telling that, he will probably put my family at stake, jeopardize my family." When asked what his concerns were about telling the police who he saw going to Landry's house when he heard the gunshots, Godfrey testified, "Retaliation. Retaliation." Defense counsel did not object. During cross-examination, defense counsel asked the following:

> Q.     Now, anywhere in the statement here, did you ever say, "Man, I don't want to talk to you because of retaliation" or "Chris Brown is going to threaten me or my family" or anything like that? Did you say that to the police? . . .
> Q.     Did you say anything to the police about the retaliation and things like that?

6

A.    I didn't tell – no, I didn't.

During the State's redirect examination of Godfrey, the following colloquy occurred:

Q.    Ed, defense counsel was just asking you about why you don't have in your statement that you were concerned about retaliation.  Do you remember that?
A.    Yes, sir.
Q.    You know the defendant?
A.    Yes, I do.
Q.    Do you think he's capable of that type of retaliation?
A.    Yes.  He's trying to send somebody to do me something now.  He been –
      [Defense counsel]:   Objection, Your Honor.
A.    –that's the only reason – I wasn't going to be involved.
      THE COURT:  Hold on.  There is an objection that's been made.
      [Defense counsel]:  Can we approach the bench?
                    (Bench Discussion Outside Hearing of the Jury)
      [Defense counsel]:  I'm going to object.  It's an extraneous offense that I was not given prior notice to. [sic]   This is on the State's questioning; and they are eliciting, I guess, other acts that we had no knowledge of.  So, I'm going to object to anything like that and ask that if you sustain it, that you will advise the jury to disregard it.
      [Prosecutor]:  He on cross was asking him about this allegation of retaliation.  I should have an opportunity to address those.
      THE COURT:  Your objection is overruled.  You opened the door.
       [Defense counsel]:  Just for the record, I had on cross because he opened the door on direct in reference to retaliation on the State's cross.  They were the ones that opened the door on this.
      THE COURT:  I didn't hear you raise an objection to it or approach.
      [Defense counsel]:  My objection is, Judge, is now he's saying that he's now coming with another criminal offense and that is sending out a hit to his family and I'm objecting to that, that I know now that he's got a hit out for me, and I'm objecting to that.
      THE COURT:  All right.  Anything else?  Your objection is overruled.
                    (Bench Discussion Concluded)

7

At the conclusion of Godfrey's testimony, the Court stated as follows:

> THE COURT: Okay. I'm reflecting upon [defense counsel]'s earlier objection. Again, I'm going to stand by the objection concerning the answer about retaliation that you asked. I'm going to stand by the Court's ruling on the objection he made. The Court deems it to be admissible – for that answer to be admissible to that question because the defense not only opened the door but under Rule 404(b), that such evidence, including evidence of threats or coercion by includes [sic] a witness is admissible to anxiousness or guilt under Rule 404(b). In the mix, [defense counsel] has requested an instruction to be made and I don't know if he was basing it upon me sustaining the objection or not. I'm overruling the objection but I do believe that the rule does allow an instruction to be made to the jury, if that's what you request based upon consciousness of guilt. What do you say?
>
> [Defense counsel]: Judge, in response to what you just said, my objection was the other offense that is now sending people out to put basically a hit on him and his family. That was my objection that I made.
>
> THE COURT: But he was under Rule 404, other evidence, okay.
>
> [Defense counsel]: But the retaliation, too, I respectfully disagree that I opened the door on retaliation. The record will reflect whatever it reflects, but it was on the State's case under direct. They opened up the door on retaliation.
>
> [Prosecutor]: His statement was different.
>
> [Defense counsel]: Well, no. He said retaliation and I asked whether or not retaliation was ever reported and I stopped it and then –
>
> THE COURT: I understand.
>
> [Defense counsel]: Then he asked again about the retaliation and then he comes up with the State's questions -- . . . .

Landry testified that when she saw Brown approach her house, she could see "this little gun thing . . . sticking . . . up in his jeans." Landry testified that after she saw Brown go into her house, she heard "[a] lot of" gunshots. According to Landry, Lomax followed Brown into the house. Landry also testified that Brown and the victim had a heated argument about a rental car the night before the shooting, and Brown threatened

8

the victim. Without objection from defense counsel, Landry testified that when she first spoke to the authorities, she did not identify Brown as the shooter because she was afraid of Brown.

Precious Wrighting testified that she had previously been married to Brown, and although the marriage ended in divorce, she and Brown began another romantic relationship years later. Wrighting and Brown were romantically involved on the day of the offense. Wrighting recalled learning on the day of the offense that Brown's cousin Cory had been shot, and Wrighting accompanied Brown to the hospital to visit Cory.

After the hospital visit, Wrighting and Brown went to the Glasshouse residence. At some point, Wrighting learned that Brown had left the house with other individuals. Wrighting testified that she left the Glasshouse residence for a doctor's appointment, and returned to her own home afterward. According to Wrighting, when Brown returned to Wrighting's house, he told Wrighting that he, Guidry, and Lomax had gone to "that guy's house" and "[Lomax] was supposed to knock on the door and [Brown] killed him." Brown told Wrighting he had shot and killed the victim, and Brown asked Wrighting to provide an alibi for him by saying he was with her at the doctor's office. According to Wrighting, Brown later told her that he was leaving to go on the run, and that he would contact her. Wrighting explained that she next had direct contact with Brown when he called her after his arrest in Houston. Wrighting testified that she decided to cooperate with the authorities "[b]ecause I feel like it's the right thing to do and I feel like if he can

9

knock on somebody's door and do something to them[,] he can come knock on my door and do it to me because I don't want to have nothing else to do with him." Counsel did not object to Wrighting's testimony.

Sue Kelly, an I.D. Technician with the Beaumont Police Department ("BPD") crime scene unit, testified that on the date of the offense, she was dispatched to a residence at 1970 East Lucas. Upon arriving at the scene, she saw the emergency medical services personnel assisting a black male gunshot victim who was lying in the front doorway. Kelly collected bullets, bullet casings, slugs, and fragments, and she turned them over to the laboratory for ballistic analysis. Kelly explained that the casings recovered from the residence were all from a .40-caliber gun.

Kelly also attended the autopsy of the victim's body, which was conducted by a forensic pathologist. According to Kelly, the pathologist recovered bullet fragments and slugs from the victim's body and turned them over to Kelly. Kelly forwarded bullets and fragments recovered from the victim's body to the crime lab for ballistic analysis.

Kelly testified that she subsequently returned to the residence to search for additional evidence after two suspects volunteered information to detectives concerning the location of the weapons used during the offense. Kelly explained that she returned to search for ammunition that might have been fired from something other than a .40-caliber weapon, but that the only other ammunition she found was from a .40-caliber weapon. Kelly forwarded the additional ammunition to the crime lab for ballistic analysis. While

at the residence, Kelly also performed a trajectory analysis based on the location of the gunshots. According to Kelly, the trajectory analysis indicated that "the shooter had to be somewhere in the vicinity of the front door[,]" the victim's body was just inside the front door, and the bullets were being fired from "high to low."

The doctor, who testified that he performed an autopsy on the victim, testified that the victim had twelve gunshot wounds, and that three bullets were recovered during the autopsy. Based upon the internal and external examination of the victim during the autopsy, he concluded that the cause of the victim's death was multiple gunshot wounds, and the manner of death was homicide.

BROWN'S ISSUES

In his first issue, Brown argues that the trial court erred by admitting extraneous offense evidence. In his second issue, Brown contends the trial erred by permitting the State to place his general reputation before the jury as character evidence when he had not placed his general reputation at issue. Specifically, Brown complains of Godfrey's testimony that Brown had been trying to send someone to harm Godfrey and Godfrey's family. Brown maintains that the defense did not open the door to testimony concerning fears of retaliation at the time of trial. Brown argues his two issues together in his brief, and we will address them together.

We review the trial court's decision to admit evidence under an abuse of discretion standard. *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). Rule 404(b) of

11

the Texas Rules of Evidence prohibits the admission of extraneous offenses to prove a person's character or to show that the person acted in conformity with that character. Tex. R. Evid. 404(b). However, when a party "opens the door," evidence that is otherwise inadmissible may become admissible. *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009). In addition, extraneous-offense evidence may be admissible when it has relevance apart from character conformity. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). Extraneous offenses may be admissible for some other purpose, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Tex. R. Evid. 404(b); *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1991) (op. on reh'g). Evidence that may otherwise be inadmissible under Rule 404(b) may be admitted to rebut a defensive theory. *Williams*, 301 S.W.3d at 687. Rule 404(b) is a rule of inclusion, not exclusion, and it excludes only evidence that is offered solely to prove bad character and, therefore, conduct in conformity with that bad character. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (citing *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996)).

To preserve error in admitting evidence, a party must make a proper objection and obtain a ruling on that objection. *Saldano v. State*, 70 S.W.3d 873, 886-87 (Tex. Crim. App. 2002); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998). "In addition, a party must object each time the inadmissible evidence is offered or obtain a running

objection." *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003). An error, if any, in the admission of evidence is cured when the same evidence comes in elsewhere without objection, either before or after the complained-of ruling. *See Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004). "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]" Tex. R. Evid. 103(a); *see* Tex. R. App. P. 44.2(b). We will not overturn a conviction if, after an examination of the record as a whole, we have fair assurance that the error did not influence the jury or had but slight effect. *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008).

As previously discussed, prior to the complained-of testimony by Godfrey, Guidry had testified that he did not want to tell the authorities about Brown's involvement in the offense because "[s]nitches get stitches." Prior to Godfrey's testimony, Lomax had testified that he gave three different statements to the police because he feared that Brown would harm Lomax's family in retaliation, and that while Lomax was incarcerated with Brown, Brown threatened to pay someone to harm Lomax. In addition, after Godfrey's testimony, Wrighting testified without objection that she came forward with what she knew about Brown's involvement because she feared that Brown would harm her because she no longer wanted to be involved with him. Therefore, we conclude that any error in the admission of the complained-of testimony by Godfrey was cured when the same type of evidence concerning witnesses' fear of Brown was admitted elsewhere

13

without objection, both before and after the complained-of ruling. *See Lane*, 151 S.W.3d at 193. Furthermore, after examining the record as a whole, we have fair assurance that the error, if any, did not influence the jury, or had but slight effect. *See Taylor*, 268 S.W.3d at 592. Accordingly, we overrule Brown's issues and affirm the trial court's judgment.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on December 27, 2012
Opinion Delivered February 6, 2013
Do Not Publish

Before McKeithen, C.J., Kreger and Horton, JJ.